# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KELLEE M. L., | Case No. CV 25-7675-E |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION** |
| FRANK BISIGNANO, Commissioner of Social Security, | **AND ORDER OF REMAND** |
| Defendant. | |

## PROCEEDINGS

Plaintiff filed a complaint on August 15, 2025, seeking review of the Commissioner's denial of disability benefits. The parties consented to proceed before a United States Magistrate Judge in August of 2025. Plaintiff filed "Plaintiff's Opening Brief" on November 13, 2025. Defendant filed "Defendant's Brief" on January 7, 2026. Plaintiff filed a "Reply" on February 7, 2026.

///

///

///

**BACKGROUND**

Plaintiff asserts disability since December 10, 2020,[1] alleging chronic back pain, a spine injury, and a brain injury (Administrative Record ("A.R.") 297-312, 333). After her claims were denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ") (A.R. 89-153, 219). The ALJ held a hearing on October 19, 2023, and issued an unfavorable decision on November 9, 2023 (A.R. 17-27, 32-54). The ALJ found "persuasive" opinions from psychological consultative examiner Dr. Roger Izzi and state agency physician Dr. Karen Ying in determining that Plaintiff retains the residual functional capacity ("RFC") to perform work involving simple, routine tasks with no direct public interaction (A.R. 21-25).[2]

---

[1]    Plaintiff previously applied for and was denied benefits on initial review through December 9, 2020 (A.R. 55-88, 113, 154-85, 342).

[2]    Dr. Izzi found Plaintiff would be capable of performing simple and repetitive tasks and would have moderate limitations in getting along with peers or being supervised at work (A.R. 437-41). Dr. Ying reviewed the record (including Dr. Izzi's opinion) and found that Plaintiff had moderate limitations in several areas of functioning (i.e., maintaining concentration, persistence and pace, maintaining attention and concentration for extended periods of time, completing a normal workday or workweek without interruptions from psychologically based symptoms or performing at a consistent pace without an unreasonable number and length of rest periods, understanding, remembering and carrying out detailed instructions, interacting with others and interacting appropriately with the public, and responding appropriately to criticisms from supervisors) (A.R. 69-75, 79-83). Notwithstanding those limitations, Dr. Ying opined that Plaintiff would be capable of "SRT LPT" (simple repetitive tasks with limited public contact) (A.R. 75), which she detailed in her mental RFC assessment as understanding/remembering short/simple instructions, maintaining attention and concentration for two-hour increments, eight hours a workday, 40 hours a workweek, and interacting with supervisors and coworkers in the general workplace but having limited public contact (A.R. 79-83).

After the Appeals Council denied review (A.R. 1-3), Plaintiff filed a complaint with this Court in Kellee M. L. v. O'Malley, C.D. Cal. Case No. 24-1430-E (A.R. 663-66).  Plaintiff argued in part that the ALJ's RFC assessment for simple, routine tasks with no public contact failed to account for Dr. Ying's opinion that Plaintiff could understand and remember only short/simple instructions, or Dr. Izzi's opinion that Plaintiff would have moderate limitations in getting along with peers (coworkers) and being supervised at work.  See Docket No. 16 at 4-8 in Kelly M. L. v. O'Malley.  The Court remanded the matter back to the Administration because the ALJ's RFC assessment for simple, routine tasks had not necessarily accounted for Dr. Ying's opinion that Plaintiff could understand and remember only short/simple instructions (A.R. 632-38).  The Court declined to reach Plaintiff's other arguments, except insofar as to determine that reversal with a directive for the immediate payment of benefits would not have been appropriate (A.R. 637 n.2).  The Appeals Council then vacated the final decision and remanded the matter to the ALJ for further proceedings (A.R. 628).

On remand, the ALJ held another hearing on June 3, 2025, and issued another unfavorable decision on June 10, 2025 (A.R. 576-91, 599-625).  The ALJ found:  (1) Plaintiff suffers from severe degenerative disc disease with a T12 fracture and fusion, anxiety, and post-traumatic stress disorder ("PTSD") (A.R. 579); (2) Plaintiff could perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), limited to performing frequent postural activities except for occasionally climbing ladders, stooping, and crawling, and work involving simple, routine tasks with short, simple instructions and no direct public interaction (A.R. 582-89 (addressing Dr. Ying's assessment, but not mentioning Dr. Izzi's assessment, and discounting Plaintiff's statements and testimony suggesting greater limitations)); (3) although Plaintiff had no past relevant work, considering Plaintiff's age, education, and RFC, Plaintiff would be capable of performing jobs

3

existing in significant numbers in the national economy (A.R. 589-91 (adopting vocational expert testimony at A.R. 620-24)).

## STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if:  (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards.  See Carmickle v. Comm'r, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

## DISCUSSION

Plaintiff contends that the ALJ erred in determining Plaintiff's RFC by failing to consider Dr. Izzi's assessment and by improperly discounting Plaintiff's subjective complaints (Plaintiff's Opening Brief at 3-11; Reply at 2-5).  Defendant argues that there was no material error because:  (1) the ALJ assertedly need not have discussed Dr. Izzi's opinion which was from October of 2020—two months before the alleged onset date—and the ALJ's RFC assessment for short, simple instructions with no public interaction allegedly accommodated any moderate limitations Plaintiff has in getting along with peers or being supervised in a work setting; and (2) the ALJ assertedly stated legally sufficient reasons for discounting Plaintiff's subjective complaints (Defendant's Brief at 2-9).

As discussed below, the Court finds that the ALJ did not state legally sufficient reasons for discounting Plaintiff's subjective complaints.  The Court need not and does not reach Plaintiff's remaining argument, apart from determining that reversal with a directive for the immediate payment of benefits would not be appropriate.  However, on remand, the Administration should clearly indicate whether and how Dr. Izzi's opinion has been considered.  See 20 C.F.R. §§ 404.1520c, 416.920c (requiring ALJs to articulate how they consider the supportability and consistency of medical opinions).

## I.    Summary of the Treatment Record

The earliest available treatment records are from August of 2021.[3]  Social worker Rashea Murphy evaluated Plaintiff for mental health services including housing assistance (A.R. 445-61).  Plaintiff had been homeless for five years before being placed in transitional housing in June of 2021 (A.R. 451).  She then was caring for her 11-month-old son (A.R. 452).  Plaintiff admitted a history of stimulant use disorder from ages 21 to 25, with her last use of methamphetamines in September of 2020 (A.R. 446, 448-49).  Since her housing placement, Plaintiff was receiving relapse prevention classes, counseling, and case management services (A.R. 451).  Plaintiff also was taking Bupropion, and her depression screening score indicated moderately severe depression (A.R. 445).  Ms. Murphy referred Plaintiff for medication evaluation and therapy (A.R. 454).

At a medication evaluation later in August, Plaintiff indicated that Wellbutrin (Bupropion) was helpful (A.R. 473).  She inconsistently reported that

---

[3]    As noted above, consultative examiner Dr. Izzi evaluated Plaintiff in October of 2020 (A.R. 437-41).  Dr. Izzi diagnosed "Major Depressive Disorder with Anxious Distress" (A.R. 440).

she had "no medical issues" and that she had a TBI (traumatic brain injury) and a broken back (A.R. 473-74).  She was not then taking any "physical health medications" (A.R. 474).  The doctor recommended that Plaintiff take a lesser dose of Wellbutrin to limit a risk of seizures, and Plaintiff reportedly became irritable and said, "I don't think it's right that you talk to me for 20 [minutes] and then start talking about reducing my medications.  I think I want to get my medications elsewhere" (A.R. 474).

The next week, Plaintiff presented to new primary care doctor, Dr. Jamshid Niknam (A.R 487-88).  She reported depression and a fall in 2017 causing a TBI and breaking her skull and spine in two places, for which she had undergone surgery (A.R. 487).  Plaintiff complained of chronic pain, but indicated she did not like taking medications—she wanted to have physical therapy and spinal injections instead (A.R. 487).  She reported that she was taking 450 mg of Bupropion and was stable on that dose, and she denied a history of seizures (A.R. 487).  She reportedly had full range of motion in her extremities, no edema, no erythema, and a stable gait (A.R. 487).  Dr. Niknam referred Plaintiff for physical therapy and to a neurosurgeon, and continued her Bupropion dose (A.R. 488).  Plaintiff followed up with Dr. Niknam in September, reporting that she was doing well overall and that her depression was stable on Bupropion (A.R. 486).  She received referrals to see a neurosurgeon and for physical therapy (id.).

At a therapy appointment in September of 2021, Plaintiff reportedly had a warm affect, was interested in learning about EMDR (eye movement desensitization and reprocessing) for possible treatment, and wanted to continue her current medication prescribed by her primary care physician (A.R. 463).  She was attending weekly relapse prevention meetings and caring for her one-year-old son (A.R. 463).  She said she was not having difficulty regulating her emotions,

and her medications and life situations were "helping/working for her" (A.R. 463). She requested therapy twice a month (A.R. 463).

Neurosurgeon Dr. Sasan Yadegar began treating Plaintiff in September of 2021 (A.R. 490). When Plaintiff presented for evaluation, she reported she had undergone a thoracic fusion with instrumentation after a 2017 accident, and she complained of mid-thoracic, low back and leg pain, as well as difficulty walking (A.R. 490). On examination, she exhibited weakness in her lower extremities and difficulty walking with an occasionally unstable gait, but otherwise excellent strength (A.R. 490). Dr. Yadegar did not see any sensory or motor pathology (A.R. 490). Dr. Yadegar ordered imaging (AR 490).[4]

In October of 2021, Dr. Yadegar reported Plaintiff was still complaining of upper lumbar and lower thoracic pain, she had good strength in her upper extremities, some weakness in the lower extremities, and, again, an occasionally unstable gait (A.R. 503). X-rays disclosed no apparent movement of the hardware from the fusion surgery, and Plaintiff's spine seemed to be fused (A.R. 503; see also A.R. 560-61 (x-ray reports)). Dr. Yadegar ordered thoracic and lumbar MRIs (A.R. 503). Plaintiff returned later in October, reporting more stiffness in her back and pain, and she asked for something more definitive to be done (A.R. 502). MRIs revealed no significant stenosis or spondylosis and no acute disc herniation (A.R. 502; see also A.R. 556-59 (MRI studies noting mild chronic compression fracture at T12 and to a lesser degree T11, disc protrusions from T5-T8, and slight disc bulges from L1-L3)). Dr. Yadegar indicated that Plaintiff's stiffness and pain were possibly caused by the hardware, and the doctor recommended removal

---

[4] Plaintiff also started physical therapy. There are records regarding physical therapy for pain and mobility from September and October of 2021, from June through October of 2024, and from March of 2025 (A.R. 914-28, 931-64).

surgery (A.R. 502).  Plaintiff said she wanted to think about whether to undergo the surgery (A.R. 502).

Plaintiff returned in November of 2021, complaining of low back and leg pain (A.R. 501).  Although the recommendation was to remove her hardware surgically, Plaintiff then was living in a shelter and did not want to have surgery until she was "able to stand on her feet" (A.R. 501).  Dr. Yadegar agreed to continue with pain management and prescribed Tramadol (A.R. 501).  Dr. Yadegar referred Plaintiff back to Dr. Niknam for pain management until Plaintiff was ready to have surgery (A.R. 501).  Plaintiff followed up with Dr. Niknam in December, reporting that she had seen Dr. Yadegar, had physical therapy and was improving (A.R. 523).  Dr. Niknam prescribed Lidocaine patches and refilled Plaintiff's Bupropion (A.R. 523).

Plaintiff followed up with Dr. Yadegar in February of 2022, complaining of pain (A.R. 500).  Plaintiff wanted something to be done, but she still did not have a place to stay and so she did not want to have surgery at that time (A.R. 500).  Dr. Yadegar prescribed more Tramadol and told Plaintiff to return in eight to 12 weeks for reevaluation (A.R. 500).

At monthly therapy appointments in February, March, and April of 2022, Plaintiff reportedly had an even mood and discussed her efforts to seek housing voucher placement for herself and her son, as well as her use of available resources for work training, sobriety, court matters, and self-care (A.R. 507-14).  She reported being triggered by her son's program staff in March (A.R. 510).  In May, she again had an even mood, was "overall doing well," and said she would be getting a new apartment the next day (A.R. 543).  She had an interest in seeking other therapy once she achieved stable housing (A.R. 543).

8

Meanwhile, Plaintiff returned to Dr. Niknam in April of 2022, reporting that her chronic pain was not improving with Tylenol, ibuprofen and "topicals" (A.R. 521). She said Dr. Yadegar had advised that injections were too high risk and that hardware removal was an option, but surgery was difficult for Plaintiff due to her living situation (A.R. 521). Plaintiff asked to see a psychiatrist to discuss her medications (A.R. 521). Dr. Niknam noted that Plaintiff's Lidocaine patches were "not covered," and Tramadol reportedly interacts with Bupropion, so Dr. Niknam referred Plaintiff to a psychiatrist and a pain management specialist (A.R. 521). Plaintiff followed up with Dr. Yadegar in May of 2022, complaining of worsening stiffness and pain and reporting that she did not want to have surgery at that time (A.R. 857). Dr. Yadegar prescribed Norco (A.R. 857).

Plaintiff began seeing pain management specialist Dr. Hyung Kim in June of 2022 (A.R. 547). She had recently moved to her own housing with her son (A.R. 547). She reported pain at 7-9/10, and that Tramadol and physical therapy had given her some benefit (A.R. 547). She had not been able to fill her Norco prescription because the pharmacy was temporarily out of stock (A.R. 547). She wanted to wait for hardware removal surgery until she got more settled into her home (A.R. 547). On examination, she had tenderness in her thoracic and lumbar spine, positive facet loading testing, and normal lower extremity range of motion (A.R. 548). Dr. Kim diagnosed postlaminectomy syndrome, chronic pain, and thoracic and lumbar spondylosis, and referred Plaintiff for neuropsychological testing (A.R. 548). Dr. Kim prescribed Methocarbamol for muscle spasms (A.R. 548). Dr. Kim noted that Plaintiff was using THC and would consider trying Belbuca (an opioid, see https://www.belbuca.com) or Butrans (also an opioid applied through a skin patch, see https://www.drugs.com/butrans.html) for pain, if appropriate after a "UDS" (urine drug screen) (A.R. 549).

Plaintiff returned in July of 2022, reporting that she was not ready to discontinue using THC, which gave her mild benefit for pain (A.R. 550). She also was using a stimulation unit which she found somewhat helpful (A.R. 550). Her examination findings were unchanged from the prior visit (A.R. 551). Dr. Kim referred Plaintiff for acupuncture and continued her Methocarbamol (A.R. 551-52). Plaintiff declined physical therapy "for now" (A.R. 552). Plaintiff followed up in August, reporting that she was still using THC and that electronic stimulation had been somewhat helpful (A.R. 553). Her Methocarbamol was continued (A.R. 554). She then was not a candidate for opioids because of her THC use (A.R. 555).

Plaintiff returned to Dr. Yadegar in August of 2022, reporting that she was doing better, having less mid-back pain and moving both sides equally, and she was happy with her progress (A.R. 856). Dr. Yadegar indicated that they would continue with "conservative treatment" for now—no other intervention was necessary except for pain management (A.R. 856). Dr. Yadegar refilled Plaintiff's prescription but did not identify the medication then prescribed (A.R. 856). The medication Dr. Yadegar had prescribed most recently had been Norco (A.R. 857).

Plaintiff also returned to Dr. Niknam in August of 2022, complaining of chronic back pain for which she was receiving pain management and acupuncture (A.R. 570). She reported that she was unable to sit or stand for long periods and that she felt she was unable to work and was pursuing disability (A.R. 570). She had considered spinal surgery but she did not have resources for childcare for the necessary recovery period (A.R. 570). She had decreased her Bupropion dose and her depression was well controlled (A.R. 570). Dr. Niknam refilled her Bupropion at a lower dose and referred Plaintiff to a psychiatrist (A.R. 571).

///

10

Plaintiff followed up in January of 2023, reporting that she was taking half her prior dose of Bupropion, her mood was stable, and she was happy with the dose (A.R. 568).  Her pain management specialist had only provided pharmacologic therapy, so she asked for other alternatives (A.R. 568).  Dr. Niknam prescribed Diclofenac Sodium gel and Lidocaine cream (A.R. 569).  Plaintiff returned in May, reporting that she felt better on her current Bupropion dose and her current pain treatment regimen was helping (A.R. 566).  In August, she reported that she was feeling well, and she had no acute complaints (A.R. 564).  Her medications were refilled (A.R. 565).[5]  When Plaintiff returned in November to have disability paperwork completed, she complained of chronic pain limiting her sitting and standing (A.R. 841, 852-53).  She was doing physical therapy and taking her pain medications as directed (A.R. 852).  On examination, she exhibited full range of motion in her extremities, no edema or erythema and a stable gait (A.R. 853).

The next available note is from almost a year later. Plaintiff presented to Dr. Yadegar in October of 2024, complaining of stiffness in her midback and asking for more definitive treatment (A.R. 883).  Dr. Yadegar advised that removal of the hardware was the only option (A.R. 883).  New imaging showed no additional stenosis or spondylosis (A.R. 883; see also A.R. 887-92 (new MRIs showing multilevel disc protrusions, disc bulging and spurring, and multilevel disc desiccation and degenerative changes)).  Dr. Yadegar recommended "continuing the present course" (A.R. 883).  Again, Plaintiff was considering hardware removal, but she needed a babysitter before she could commit to surgery (A.R.

---

[5]      As of January of 2025, Plaintiff was still taking Bupropion and using Diclofenac Sodium gel and Lidocaine cream (A.R. 829, 835-36).

11

883).[6]

Plaintiff consulted with neurosurgeon Dr. David Kheradyar in July and December 2024, but his handwritten notes are difficult to decipher (A.R. 877-81). Plaintiff complained of whole-body pain and paresthesias since her 2017 surgery (A.R. 909). On examination, Plaintiff's recall memory was two out of three objects with cues, and she had a very mildly antalgic gait (A.R. 910). Dr. Kheradyar ordered testing and indicated he would review Dr. Yadegar's records (A.R. 911). An EEG test and nerve conduction studies were normal (A.R. 882, 902-08).

Plaintiff saw another neurosurgeon, Dr. Deven Khosla, in January of 2025 (A.R. 970-71). Plaintiff reported a history of methamphetamine addiction and chronic low back pain at 8/10 with tightness and radiation down her legs (A.R. 971). "Conservative measures" like physical therapy, aquatherapy, neurology

---

[6]    A nurse practitioner with Dr. Niknam's office provided a "Physical Medical Source Statement" dated October 9, 2024 (A.R. 825-27). The form notes that Plaintiff had been seen every three months since August 2021 for chronic back pain causing limited mobility and limited exercise tolerance (A.R. 825). The nurse practitioner indicated that Plaintiff could walk one city block, sit for 10 minutes at a time, stand/walk for five minutes at a time, sit and stand/walk less than two hours each in an eight hour day, would need to be able to shift positions at will, would need to take 10 minute breaks every hour, could lift up to 10 pounds seldomly, and would miss more than four days of work per month (A.R. 825-27). This form is the only examining medical opinion in the record regarding Plaintiff's physical impairments. Plaintiff did not have a consultative examination for her physical impairments. The state agency physicians who reviewed Plaintiff's current applications for benefits in March and July of 2022 found insufficient evidence to assess Plaintiff's physical impairments prior to her September 30, 2021 date last insured (A.R. 119, 122, 142, 144). Based on the limited available medical record, these physicians opined that Plaintiff would be capable of a range of light work beginning on October 1, 2021 (A.R. 101-03, 124-26).

12

management with Dr. Kheradyar, smoking cannabis, and treatment with pain management specialists reportedly had been "somewhat effective," but Plaintiff was looking for a neurosurgeon to continue her care (A.R. 971). On examination, Plaintiff evidenced pain in the lower lumbar spine (A.R. 971). Dr. Khosla reviewed imaging and diagnosed chronic pain syndrome secondary to spinal cord injury (A.R. 971-75). Dr. Kholsa did not then recommend surgery to remove the hardware (A.R. 975). His recommendation was to try "conservative treatments" with pain management medications like Baclofen or Gabapentin for neuropathic pain, and referral to a pain management specialist for additional options (A.R. 975).

## II.    The ALJ Failed to Provide Legally Sufficient Reasons for Discounting Plaintiff's Testimony and Statements Suggesting Greater Limitations than the ALJ Found to Exist.

Plaintiff contends that the ALJ's stated reasoning for discounting her testimony and statements was legally insufficient. As discussed below, the Court agrees.

### A.    Summary of Plaintiff's Testimony and Statements

Plaintiff submitted written statements and gave oral testimony, claiming disability based primarily on functional limitations from chronic pain. At the first hearing, Plaintiff asserted that she could walk for only approximately 12 minutes and sit for 20 minutes to an hour before needing to lie down (A.R. 50-51). She said she would lie down five or six times every day for 40 minutes to an hour most often, but sometimes for only ten minutes when she has her son with her (A.R. 49). She said she did not think she could work at a seated job because of pain from

sitting too long and not being able to stand up or lie down frequently (A.R. 44). Her neurosurgeon had recommended removal of the hardware from the T12 fusion surgery, but it was not a practical option for her because she was a 24/7 single parent of a three-year-old son with no childcare help (A.R. 40-41). She had been prescribed pain medications, but she said she did not want to continue taking them because she was a recovering addict (A.R. 44). She then used cannabis for pain or occasional muscle relaxers and Lidocaine cream (A.R. 44-45).

Plaintiff said that she would have mental issues with working because doing regular things took her longer than before her injury (A.R. 47). She was looking into getting more intensive therapy for PTSD (A.R. 47). She was taking Bupropion ("Epropyen [phonetic]") (A.R. 47-48). She said her PTSD would get triggered every day and she would have to do things like deep breathing, rubbing silk, and taking a cold shower or ice bath to try to regulate herself (A.R. 48-49). The head trauma she suffered from her accident reportedly had caused her to have short-term memory issues and to feel "emotionally charged" (A.R. 49-50).

When Plaintiff testified at the second hearing, she was taking community college classes remotely (A.R. 603, 605). However, she had failed "a lot" of classes and had to retake them with help from tutors and accommodations for things like extra time to take tests and recorded lectures (A.R. 604-05). Plaintiff said she could not work because she sometimes gets triggered and has to work through those triggers by doing self-care or talking to a specialist (A.R. 608). She was waiting for the school semester to end to focus on trying to find an EMDR-specific therapist who takes her insurance (A.R. 608). She had seen a therapist approximately two years earlier and had taken free "spiritual life empowerment" and Reiki courses via Zoom, and she was "just like organizing direction" (A.R. 609-10).

14

Plaintiff said she could not lift 20 pounds on a regular basis (A.R. 617).  She said she could lift a gallon of milk but not repetitively (A.R. 617-18).  She said she could not stand and walk six out of eight hours because it physically hurts and, when she is in pain, she also has a more difficult time being nice (A.R. 610).  She said she could sit for up to one hour with a proper chair and pillows, or 20 minutes without, before having to get up, stretch and move around, which throws off her attention (A.R. 616).  She said she would not be able to work for an entire eight-hour day without lying down for at least an hour to relieve her pain (A.R. 617).  She said sitting in class had been so painful for her that she could not "take in" everything that was going on in class (A.R. 611).  When she takes remote classes, she sits comfortably on her bed with pillows she can adjust to prop up her head and straighten her spine, or she sits in an anti-gravity chair at her desk (A.R. 611-12).  She studied by connecting to a screen so she could position herself comfortably (A.R. 612).  She said she could drive, but she struggles with turning and did not drive for more than an hour when she had a car (A.R. 612-13).  She said she sometimes has problems concentrating (A.R. 612).

Plaintiff was attending physical therapy once a week, and would be going back to aquatic therapy twice a week when her semester ended (A.R. 613).  She again said she had been prescribed pain medications, but she avoided taking pain medication as much as possible because she had a history of substance abuse (A.R. 607).  She said she had only four good days a month, and her mornings were generally bad, her nights were bad, and her days were "hit or miss" (A.R. 613).  On bad days, she struggles to get off the toilet because something feels "stuck," and she rolls out of bed and tries to stretch, but does not leave her bed "a lot" other than to feed her son and to use the bathroom (A.R. 614).

///

///

15

In a Function Report form, Plaintiff asserted that she had chronic pain and muscle spasms limiting her movement, lifting capacity, and sleep (A.R. 348). She indicated she could not sit or stand for long periods of time, lift her own body weight, tie her shoes, or lie down without pain (A.R. 349). She reported she could lift 20 pounds, stand/walk/sit for 20 minutes each before needing to rest, kneel for ten minutes, climb two flights of stairs, and she claimed to have issues keeping her balance, squatting, bending, and using her hands (A.R. 353). She estimated she could pay attention for 10-30 minutes at a time and could follow short instructions well but not spoken instructions (A.R. 353). She indicated she does not get along with authority figures well because they tend to be insensitive to her disabilities (A.R. 353). She also indicated that she has problems getting along with her family because her family is insensitive to her injuries (A.R. 352).

### B.     Applicable Law

Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause some degree of the pain and other symptoms of which the claimant subjectively complains (A.R. 584), any discounting of the claimant's complaints must be supported by "specific, cogent" findings. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must offer "specific, clear and convincing" reasons to reject a claimant's testimony where there is no evidence of "malingering").[7]

---

[7]     In the absence of an ALJ's reliance on evidence of "malingering," most recent Ninth Circuit cases have applied the "clear and convincing" standard. See, e.g., Nerio Mejia v. O'Malley, 120 F.4th 1360, 1363 (9th Cir. 2024); Ferguson v. O'Malley, 95 F.4th 1194, 1197-98 (9th Cir. 2024); Glanden v. Kijakazi, 86 F.4th

16

Generalized, conclusory findings do not suffice.  An ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal citations and quotations omitted); see Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ must "specifically identify the testimony [the ALJ] finds not to be credible and must explain what evidence undermines the testimony"); Smolen v. Chater, 80 F.3d at 1284 ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."); see also SSR 96-7p (explaining how to assess a claimant's credibility), superseded, SSR 16-3p (eff. Mar. 28, 2016).[8]

### C.   Analysis

In determining Plaintiff's RFC for a range of light work, the ALJ summarized Plaintiff's testimony and statements and found Plaintiff's "statements

---

838, 846 (9th Cir. 2023); Smartt v. Kijakazi, 53 F.4th 489, 497 (9th Cir. 2022) ("Smartt"); Leon v. Berryhill, 880 F.3d 1041, 1046 (9th Cir. 2017); see also Ballard v. Apfel, 2000 WL 1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier cases).  In Ahearn v. Saul, 988 F.3d 1111, 1116 (9th Cir. 2021), the Ninth Circuit appeared to apply both the "specific, cogent" standard and the "clear and convincing" standard.  In the present case, the ALJ's findings are insufficient under either standard, so the distinction between the two standards (if any) is academic.

[8]   Social Security Rulings are binding on the Administration.  See Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).  The appropriate analysis under the superseding SSR is substantially the same as the analysis under the superseded SSR.  See R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5, 2016) (stating that SSR 16-3p "implemented a change in diction rather than substance") (citations omitted); see also Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (suggesting that SSR 16-3p "makes clear what our precedent already required").

concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record" (A.R. 583-84). The ALJ asserted generally that Plaintiff's statements were inconsistent with: her most recent treatment notes suggesting that she continue conservative treatment; the lack of any record of recent mental health treatment; and an allegedly significant gap in mental health treatment (A.R. 584). The ALJ then summarized the treatment record before stating a conclusion that the assessed RFC "reflected" Plaintiff's physical and mental impairments (A.R. 584-87).

The ALJ's summary of the treatment record is not sufficiently specific for the Court to conclude that the ALJ rejected Plaintiff's testimony concerning her limitations on permissible grounds. Moisa v. Barnhart, 367 F.2d at 885. The ALJ did not link any of the evidence to Plaintiff's specific alleged limitations (A.R. 584-86). The Ninth Circuit does "not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits." Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020). However, the Ninth Circuit does require that ALJs "specifically identify the testimony [from a claimant] she or he finds not to be credible and [ ] explain what undermines that testimony." Id. (quoting Treichler v. Comm'r, 775 F.3d 1090, 1102 (9th Cir. 2014)).

The ALJ's general reasoning is not adequate for discounting the totality of Plaintiff's statements and testimony concerning her physical limitations. The ALJ did not clearly state any reason for discounting Plaintiff's alleged physical limitations beyond recent recommendations that Plaintiff continue "conservative treatment" (A.R. 584-86). The ALJ noted that, while Plaintiff reported chronic pain on a daily basis, Plaintiff admitted she did "not like taking medications" and instead expressed interest in physical therapy and spinal injections (A.R. 584

18

(citing A.R. 487 (Dr. Niknam's August 2021 treatment note)).  The ALJ characterized the subsequent treatment notes as documenting that Plaintiff was not as limited as she alleged, but the ALJ did not specifically explain how those notes supposedly justified this characterization (A.R. 584).  The ALJ cited, inter alia, (1) Dr. Niknam's September 2021 treatment note stating Plaintiff reported she was doing well overall and had an appointment pending with a neurosurgeon (A.R. 486); (2) Dr. Yadegar's September 2021 treatment letter reporting Plaintiff had weakness in her lower extremities and difficulty walking on examination, but no apparent or motor pathology—before any imaging studies were available (AR 490); (3) later MRI studies showing mild chronic compression fracture at T12 and to a lesser degree at T11, and disc protrusions and bulges (A.R. 556-59); (4) Dr. Yadegar's October 2021 treatment letter recommending hardware removal surgery upon reviewing the MRI studies, stating Plaintiff did not wish not to proceed with surgery then because she did not have a place to stay (so Dr. Yadegar prescribed Tramadol) (A.R. 502); and (5) Dr. Niknam's December 2021 treatment note reporting Plaintiff was improving (after Plaintiff had started physical therapy and had started taking Tramadol) (A.R. 523).  See A.R. 584-85.  The ALJ noted that Plaintiff had been prescribed Tramadol and Norco, and reported to be doing better with less pain by August of 2022, and was happy with her progress, so Dr. Yadegar chose to continue with "conservative treatment" by pain management. (AR 585 (citing A.R. 500, 856-57)).  However, the ALJ also noted that Plaintiff was diagnosed with uncontrolled chronic pain in May of 2023, and was told that she could not have injections because such treatment was too high risk and Tramadol interacted with Bupropion (A.R. 585 (citing A.R. 566 (Dr. Niknam's May 2023 treatment note stating Plaintiff needed to follow up with pain management and neurosurgery)).  The ALJ also incorrectly asserted that Dr. Yadegar recommended in October of 2022 that Plaintiff "continue with the present course" although Plaintiff was still thinking about hardware removal (A.R. 586

(citing A.R. 883)).  The treatment letter the ALJ cited is Dr. Yadegar's October 2024 note stating that the only option Plaintiff could consider was removal of her hardware, but Plaintiff needed a babysitter before she could commit to surgery, so the doctor recommended Plaintiff "continue with the present course" and follow up in six weeks (A.R. 883).  Finally, the ALJ cited Dr. Khosla's one and only treatment note reporting Plaintiff had pain on examination and recommending that she try conservative treatment with pain management instead of surgery (A.R. 585-86 (citing A.R. 971, 975)).[9]

An ALJ sometimes may rely on a limited or conservative course of treatment to justify the discounting of a claimant's subjective complaints.  See, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007), cert. denied, 552 U.S. 1141 (2008) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (in assessing the credibility of a claimant's pain testimony, the Administration properly may consider the claimant's "minimal conservative treatment" and the treating physician's failure to prescribe (and the claimant's failure to request) medical treatment commensurate with "supposedly excruciating pain") (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (permissible credibility factors in assessing pain testimony include limited treatment and minimal use of medications).  In the present case, however, it is not at all clear that Plaintiff's course of treatment was "conservative" as that term is

---

[9]     These records do not suggest what degree of functional limitation Plaintiff may have had as a result of her degenerative disc disease.  To the extent the ALJ may have intended to assert that the objective medical evidence suggested less severe physical limitations than Plaintiff alleged, such assertion is not supported by substantial evidence.

used in social security case law.

Although Plaintiff's neurosurgeons described her course of treatment as "conservative" (when compared to surgery), this Court previously has stated that consistent treatment with opioid pain medications (including Norco and Tramadol) cannot properly be characterized as "conservative" within the meaning of Ninth Circuit jurisprudence. See Carlos M. A. v. Kijakazi, No. ED CV 22-0038-E, 2022 WL 16894847, at *3 (C.D. Cal. July 11, 2022) (collecting cases pre-Smartt and finding that regular treatment with prescription narcotic pain medications was not "conservative" treatment). While Plaintiff did indicate that she disliked taking pain medications because she was a recovering methamphetamine addict (A.R. 44), the record shows that, when her only options were surgery or pain medications which included opioids (Tramadol and Norco), physical therapy, and acupuncture, she opted for pain medications, physical therapy, and acupuncture because she would not have childcare help for her young son while she recovered from surgery (A.R. 570, 883). She also sought other treatment options from her neurosurgeons to address her chronic pain (A.R. 500, 502, 971). It is not clear how often or for how long Plaintiff took Tramadol and Norco—Dr. Yadegar's letters do not include detail concerning the quantity or frequency of prescriptions. In context and on the current record, the Court cannot agree that any "conservative treatment" recommendations supplied a legally sufficient reason for discounting the totality of Plaintiff's subjective pain complaints.

Additionally, the Court observes that it is improper to fault a claimant for declining to undergo surgery where the claimant has a good reason for so declining. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis where the claimant has a good

reason for not seeking more aggressive treatment."). Here, Plaintiff said she declined recommended surgery because of the need to take care of her child. The ALJ did not comment on the validity of Plaintiff's stated reason for declining surgery.

Defendant asserts that certain opinions and prior administrative medical findings contradict Plaintiff's subjective complaints. See Defendant's Brief at 8-9 (citing A.R. 25-27 (pages from the previous administrative decision)). The Court may not rely on reasons other than specific reasons stated by the ALJ. See Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015) (court is constrained to review only the reasons the ALJ specifically identified); cf. Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) (the court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision"); see also Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("Connett") (reversing district court's decision where the district court had affirmed on the basis of reasons supported by the record but unstated by the ALJ). Accordingly, the Court cannot properly credit Defendant's assertion as an additional reason to discount Plaintiff's subjective complaints. That which Defendant asserts is unspecific and was not clearly cited in the present administrative decision as a reason for discounting Plaintiff's subjective complaints.[10]

---

[10]    The ALJ's stated reasoning for discounting Plaintiff's alleged mental limitations is more specific than the ALJ's stated reasoning for discounting Plaintiff's alleged physical limitations. The ALJ stated that Plaintiff's mental status examinations were typically normal and Plaintiff reported she was doing well (A.R. 586 (citing A.R. 473-74, 486, 507, 510, 523, 543, 551)). The ALJ also stated that Plaintiff had a gap in mental health treatment from July 2022 to July 2024 (A.R 587). The Ninth Circuit has observed that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in

22

## III.   Remand for Further Administrative Proceedings is Appropriate.

Remand is appropriate.  The circumstances of this case suggest that further development of the record and further administrative review could remedy the ALJ's errors.  See McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011); see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Leon v. Berryhill, 880 F.3d 1041, 1044 (9th Cir. 2017) (reversal with a directive for the immediate calculation of benefits is a "rare and prophylactic exception to the well-established ordinary remand

seeking rehabilitation." Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) ("Nguyen") (citations and quotations omitted); see also Martinez v. Kijakazi, 2022 WL 7375569, at *2 (9th Cir. Oct. 13, 2022) (the ALJ erred in discounting claimant's allegations based on lack of treatment while failing to address evidence that lack of treatment was itself due to the claimant's mental impairment); Garrison v. Colvin, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (quoting Nguyen).  The ALJ found Plaintiff has severe anxiety and PTSD.  Plaintiff's failure regularly to seek mental health treatment, beyond that which was required for her to be prescribed Bupropion throughout the alleged disability period, is not substantial evidence to support the ALJ's discounting of Plaintiff's testimony and statements concerning her alleged mental limitations.  See id.  However, the fact that Plaintiff's symptoms appeared to have improved/stabilized with regular Bupropion treatment is substantial evidence that could support discounting Plaintiff's testimony suggesting greater mental limitations than the ALJ assessed.  See Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").  Even so, because the ALJ did not discuss how the evidence of improvement related to Plaintiff's specific alleged mental limitations in her attention span, concentration, and ability to get along with others, it is not clear that the ALJ considered and rejected Plaintiff's testimony and statements concerning her mental limitations on permissible grounds.

23

rule"); Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Treichler v. Comm'r, 775 F.3d 1090, 1101 n.5 (9th Cir. 2014) (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); Harman v. Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038 (2000) (remand for further proceedings rather than for the immediate payment of benefits is appropriate where there are "sufficient unanswered questions in the record"); Connett, 340 F.3d at 876 (remand is an option where the ALJ fails to state sufficient reasons for rejecting a claimant's excess symptom testimony); but see Orn v. Astrue, 495 F.3d 625, 640 (9th Cir. 2007) (citing Connett for the proposition that "[w]hen an ALJ's reasons for rejecting the claimant's testimony are legally insufficient and it is clear from the record that the ALJ would be required to determine the claimant disabled if he had credited the claimant's testimony, we remand for a calculation of benefits") (quotations omitted); see also Brown-Hunter v. Colvin, 806 F.3d at 495-96 (discussing the narrow circumstances in which a court will order a benefits calculation rather than further proceedings); Ghanim v. Colvin, 763 F.3d 1154, 1166 (9th Cir. 2014) (remanding for further proceedings where the ALJ failed to state sufficient reasons for deeming a claimant's testimony not credible); Vasquez v. Astrue, 572 F.3d 586, 600-01 (9th Cir. 2009) (a court need not "credit as true" improperly rejected claimant testimony where there are outstanding issues that must be resolved before a proper disability determination can be made). There remain significant unanswered questions in the present record.

///

///

///

///

**CONCLUSION**

For all of the foregoing reasons, the decision of the Commissioner of Social Security is reversed, and the matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:  March 24, 2026

_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE